UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LIONEL BEAUCHAMP,

    Petitioner,

v.

CASE: 2:07-CV-12509
JUDGE LAWRENCE P. ZATKOFF
MAGISTRATE JUDGE PAUL J. KOMIVES

KENNETH McKEE,

    Respondent.

_____/

## REPORT AND RECOMMENDATION

I.    RECOMMENDATION: The Court should deny petitioner's application for the writ of habeas corpus.

II.    REPORT:

A.    *Procedural History*

    1.    Petitioner Lionel Beauchamp is a state prisoner, currently confined at the Bellamy Creek Correctional Facility in Ionia, Michigan.

    2.    In 2004, petitioner was convicted of first-degree murder, premeditated, MICH. COMP. LAWS § 750.316, and second-degree murder, MICH. COMP. LAWS § 750.317, following a jury trial in the Wayne County Circuit Court. On July 9, 2004, he was sentenced to life in prison for the first-degree murder conviction, and 25 to 40 years in prison for the second-degree murder conviction.

    3.    Petitioner appealed as of right to the Michigan Court of Appeals raising, through

counsel, the following claims:

    I.    THE PROSECUTION COMMITTED MISCONDUCT THROUGH IMPROPER QUESTIONING AND ARGUMENT, AND "BOLSTERING" THE TESTIMONY OF A KEY WITNESS.

    II.    AT TRIAL, PETITIONER WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED TO HIM BY THE FEDERAL AND STATE CONSTITUTIONS.

    III.    THE EVIDENCE OF PREMEDITATION WAS INSUFFICIENT AS A MATTER OF LAW TO SUPPORT PETITIONER BEAUCHAMP'S CONVICTION FOR FIRST-DEGREE MURDER, AND THEREFORE THE TRIAL COURT ERRED IN DENYING HIS MOTION FOR DIRECTED VERDICT.

    IV.    THE TRIAL COURT ERRED IN ADMITTING INTO EVIDENCE PHOTOGRAPHS DEPICTING THE DEAD BODY OF DECEDENT DUJAUN GILCHRIST. THE PHOTOGRAPHS WERE UNDULY PREJUDICIAL AS THEIR GRUESOME NATURE OUTWEIGHED THEIR PROBATIVE VALUE.

The court of appeals remanded the case for an evidentiary hearing on the matter of ineffective assistance of counsel pursuant to *People v. Ginther*, 390 Mich. 436 (1973). On remand, the trial court found that petitioner's trial counsel was ineffective. The Court of appeals reversed this finding, found no merit to petitioner's remaining claims, and affirmed his conviction and sentence. *See People v. Beauchamp*, No. 257025, 2006 WL 657068 (Mich. Ct. App. 2006) (per curiam).

    4.    Petitioner, through counsel, sought leave to appeal in the Michigan Supreme Court raising only the ineffective assistance of counsel claim. The Supreme Court denied petitioner's application for leave to appeal in a standard order. *See People v. Beauchamp*, 477 Mich. 896, 722 N.W.2d 435 (2006).

    5.    Petitioner, through counsel, filed the instant application for a writ of habeas

corpus on October 25, 2006. As grounds for the writ of habeas corpus, he raises only his ineffective assistance claim.

6. Respondent filed his answer on January 7, 2008. He contends that petitioner's claim is without merit.

7. Petitioner filed a reply to respondent's answer on January 18, 2008.

B. *Factual Background Underlying Petitioner's Conviction*

This case arose from two murders that took place on December 22, 2000. The factual background and procedural posture are accurately summarized in respondent's answer in opposition to petition for writ of habeas corpus:

> Petitioner was convicted of first and second degree murder for hiring his cousin Vaudi Higginbotham to kill DuJuan Gilchrist and Chaz Richards. The Michigan Court of Appeals summarized the facts of the case as follows:
>> Here, defendant told Higginbotham to kill Gilchrist because defendant thought Gilchrist had stolen his car. Defendant promised to pay Higginbotham $500. The plan to kill Gilchrist was formulated a few days before the shooting, when defendant believed his car had been stolen. On the day of the shooting, defendant twice instructed Higginbotham to perform the killing in his absence while he left the scene for various reasons, and they even discussed what weapon to use. Defendant took the time to promise Higginbotham another $500 to kill Richards, which was sufficient time to allow defendant to take a "second look." Defendant's actions after the crime, i.e., his flight, do not refute that defendant premeditated the killings.
>
> Following his convictions, Petitioner filed an appeal of right claiming, among other things, that his retained trial attorneys were ineffective for failing to impeach Higginbotham with two letters he purportedly wrote Petitioner while in jail. The Court of Appeals remanded the case for an evidentiary hearing on the ineffective-assistance claim.
>
> Petitioner had retained defense attorneys Wright Blake and Byron Pitts. Co-counsel Pitts testified first at the hearing. He acknowledged receiving the two letters prior to trial; one dated February 27, 2004, the other dated March 1, 2004. (11/02/05, p 10). Pitts explained the defense strategy was to show through defense witnesses that Higginbotham, not Petitioner, had a motive to kill and had made threats in the past. (11/02/05, p 13). Cross-examination was designed to

show that Higginbotham was a rival drug dealer of the victim and was receiving reduced charges in exchange for testifying against Petitioner. (11/02/05, p 15).

Pitts testified that he and Blake reviewed the letters given to them by Petitioner's family "several times, weighing the pros and cons." (11/02/05, p 17). He recalled the reason for not using the letters was that he and Blake felt their case was strong enough without placing the potentially damaging information in the letters before the jury:

> Q. As co-counsel, why weren't the letters used at trial?
>
> A. That's a fair question. Okay. As I recall in my discussion with Mr. Blake, we felt we had a very strong case with the witnesses that were coming in. We had, I think, a guy named Isiah Patterson, and another guy – if I can look in my witness list, who were going to testify about – who were going to impeach. We knew what they were going to say. They were going to impeach the credibility of Vaudi Higginbotham. That Mr. Beauchamp, the fact that Mr. – excuse me, the fact that Mr. Higginbotham had made threats against – excuse me, yes, Mr. Higginbotham had made threats against Mr. Pryor in the past; that he was a rival drug dealer. None of this – of course he didn't testify to this on direct. He had motive, incentive, and opportunity to kill. The letters – first of all, we knew there were two letters. The first letter is dated, I think, February 27, I believe. I mean –
>
> Q. You are correct, February 27, '04.
>
> A. And in that letter there is some statements in there about – first of all, that Mr. Beauchamp is on the run, which is not something we really wanted to emphasize to the jury. We felt because a lot of times juries feel rightly or wrongly that when someone is on the run that somebody is doing something wrong. [11/02/05, pp 17-18.]

In addition to stating that Petitioner was on the run, the first letter also refers to Petitioner failing to give Higginbotham money. Pitts explained that not only was this potentially damaging in itself, but the tone of the second letter completely changed and neither he nor Blake could be sure what kind of answers Higginbotham might give:

> Q. Let me ask you this, since you are referring to that letter, does the letter state Mr. Higginbotham's reason for testifying against Mr. Beauchamp?
>
> A. In that first letter?
>
> Q. Yes, February 27, 2004.
>
> A. I think he said I'm mad at you because you wouldn't bring me any money.
>
> Q. Now wouldn't that be an important fact for impeachment purposes, to know that Vaudi Higginbotham had a motive, as you said earlier, had a motive to testify against Mr. Beauchamp?

> A. You know our thinking was this – and Mr. Blake and I kicked this around for several hours – about how to approach these letters. Our concern was that Mr. Higginbotham, we felt him to be untruthful.  He says something about you're [sic] not giving me any money.  And then days later a new letter comes with a completely different tone and information. So our question was what if, you know, what is Mr. Higginbotham going to say.
> Q. You know there is at least two letters?
> A. We don't know if there is more, more conversation.  We were concerned about the issue of the money.  Is Mr. Higginbotham going to come out and say something about Mr. Beauchamp.
> Q. But –
> A. I'm not finished.
> Q. Wait.
> A. We were concerned to open the door into this line of questioning; when you don't know where it's going to go.  Is it going to hurt?  It's a judgment call.  We were concerned to open that door; would it hurt Mr. Beauchamp?  We felt because we didn't know what Vaudi Higginbotham was going to say.
> [11/02/05, pp 18-20.]

After reading the February 27 letter into the record, Pitts acknowledged Higginbotham's statement that Petitioner left him "high and dry" could be a reason for taking a deal.  (11/02/05, pp 21-25).  However, Pitts pointed out that Higginbotham taking a deal was brought out at trial without the jury hearing about Petitioner being on the run or giving Higginbotham money, and without Higginbotham having to explain the sudden change between the two letters. (11/02/05, p 27).  Pitts reiterated that counsel felt they had a strong case based on the defense witnesses and were concerned that there was no way to know what sort of answers Higginbotham might give in front of the jury:

> It's our understanding and practice that you don't want to ask a witness a question you don't know the answer to. We know what we thought.  We had strong witnesses the goal wasn't to impeach the credibility of Vaudi Higginbotham by asking him questions we don't know the answer to.  Because we know, eventually, he's going to have to explain why I said one thing and now I'm here saying something else. When the issue of money comes up which the letter says – you didn't say anything about money; now you are going to say something, lie on the Beauchamp family, which we believe in front of the jury is what this man is going to say. We felt it was riskier to ask him questions we didn't know the answer to. In terms of common sense, he is going to have to explain his reasons, explain why the letter would be one with one tone and one with the next, and then why is he testifying in a particular way. He seems like a loose cannon.  The trial will just blow up on you like

that. I hope I answered your question. I'm not sure if I have. [11/02/05, p 27.]

Pitts then read the March 1 letter into the record. (11/02/05, pp 28-30). In that letter, the writer states he knows Petitioner had nothing to do with the murders and cannot go on living a lie. (11/02/05, p 29). Again, Pitts explained that he and Blake felt using these letters to impeach Higginbotham at trial was too risky because there was no way to know how Higginbotham would explain his sudden change between the first and second letter, then back again to testify against Petitioner:

> [Blake] decided he felt the best interests of Mr. Beauchamp was to not open the – by using these letters it was opening the door to who knows. We know there is more than one letter. We know that's the first letter, and the second letter. There is talk of money. You didn't send me any money. Then all of a sudden four or five days letter [sic], a new letter comes that is completely different in tone.
> It was Mr. Blake's feeling that opening up this door – You don't know what Mr. Higginbotham is going to say. You don't ask questions of witnesses when you don't know what they are going to say; especially in front of a jury. So it was Mr. Blake's decision not to use it. I thought the reasoning was sound. [11/02/05, pp 31-32.]

Upon further questioning by appellate counsel, Pitts again reiterated that counsel felt their case was strong enough without delving into the unknown in front of a jury:

> [W]e felt we had a very strong case with the witnesses we were going to bring in. You don't ask questions of a witness when you don't know what the answer is going to be in front of a jury. It can blow up in your face. We knew that. Common sense says that Mr. Higginbotham had already testified against Mr. Beauchamp. In introducing these letters, certainly common sense says that Mr. Higginbotham has got to justify why he has this change of heart. What is the man going to say? I thought the analysis of, you know, opening that door, we have no idea what he is going to say, is he going to say something against it; it's a judgment call based upon experience in doing this. Mr. Blake has been doing it for fifteen years, twenty years. What is the man going to say in front of the jury that we cannot take back once it's out there? So we felt it was a risk [sic] move given what we had to work with. [11/02/05, pp 33-34.]

Pitts acknowledged attacking Higginbotham's credibility was important, but explained the goal was to do so while exposing Petitioner to the least amount of harm. (11/02/05, pp 34- 35). As he explained on cross, "our objective is always to help Mr. Beauchamp. That is what we were retained to do. We wanted to minimize any information that would come in, that would – that the jury could construe against Mr. Beauchamp." (11/02/05, p 37). By way of example,

Higginbotham testified that Petitioner had paid him and the February 27 letter refers to paying money. Assuming the March 1 letter was written by Higginbotham, the sudden change of heart and inability to go on "living a lie" might suggest that he was paid. (11/02/05, p 38).

Lead counsel Wright Blake estimated visiting Petitioner in jail 20-to-30 times to discuss the case. (11/02/05, pp 45-46). Blake acknowledged receiving the March 1 letter from someone in Petitioner's family, but expressed uncertainty as to whether it was written by Higginbotham and his opinion that the handwriting in the letters appeared different. (11/02/05, pp 46-47, 50).

Blake explained that since Petitioner admitted being present, the theory of defense was mere presence; that Petitioner did not participate or aid and abet Higginbotham. (11/02/05, p 48). When asked why he did not use the March 1 letter to discredit Higginbotham, Blake explained that he felt there was enough to discredit Higginbotham without risking potentially damaging testimony:

> I felt I had enough to discredit Mr. Higginbotham. The fact that he initially – his lawyer had initially asked for a competency hearing; he was offered second- degree murder in exchange for cooperation; as well as a federal, I guess federal sentence on the charge. To me, Mr. Higginbotham was just very – his testimony was incredible. I thought the jury would see that and they didn't. The letter, I don't know how many letters were out there. I don't know how many he had sent. I didn't want to get into asking him about the letter because there was a previous letter that just was completely different from the one that is dated March 1st. [11/02/05, p 49.]

As Blake put it, he did not know why Higginbotham would "all of a sudden go 180 degrees the other way." (11/02/05, p 50). Like Pitts, Blake noted, "I didn't want to ask him in front of a jury a question that I didn't know the answer to." (11/02/05, p 51). He acknowledged that the March 1 letter was exculpatory, but also noted the only way to verify that Higginbotham wrote the letter was to ask Higginbotham, and Blake did not think he was trustworthy. (11/02/05, p 50).

Regarding the February 27 letter, Blake indicated he believed it would also "open up a can of worms." (11/02/05, pp 56-57). "The part about the wooden nickel indicates maybe he was supposed to receive some kind of money from Mr. Beauchamp." (11/02/05, p 57). In addition to money, the February letter also referred to Petitioner being "on the run," neither of which Blake felt was helpful for Petitioner. (11/02/05, pp 58-59). Blake acknowledged that both letters together were inconsistent and could cast doubt on Higginbotham's credibility, but reiterated his concern over whether Higginbotham wrote both letters. (11/02/05, p 59).

On cross, Blake agreed that his trial strategy was to impeach Higginbotham's credibility through three defense witnesses. (11/02/05, pp 61-62). Blake indicated that he discussed the case with Petitioner and explained the benefit of introducing expected evidence through the witnesses, as opposed to asking

questions with unknown answers.  (11/02/05, p 61).

Resp't's Answer, at 3-9.

C.     *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996).  *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997).  Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694.  "[T]he 'unreasonable application' prong of § 2254(d)(1)

permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694.  However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous.  The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court."  Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412.  Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.'  In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16.  Further, although the

requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp.2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

D.   *Discussion*

   1.   *Clearly Established Law*

The Sixth Amendment right to counsel and the corollary right to effective assistance of counsel protect the fundamental right to a fair trial. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense. *Id*. at 687. These two components are mixed questions of law and fact. *See id*. at 698. Further, "[t]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697. If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.*

With respect to the performance prong of the inquiry, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance. *See id*. at 689; *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). "[D]efendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). "[T]he court should recognize that

counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. at 690. With respect to the prejudice prong, the reviewing court must determine, based on the totality of the evidence before the factfinder, "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id*. at 695.

    2.    *Analysis*

In analyzing petitioner's ineffective assistance of counsel claim, an expression of state law is binding on this Court. *See Basile v. Bowersox*, 125 F. Supp. 2d 930, 960 (E.D. Mo. 1999). *See generally*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Sarausad v. Porter*, 503 F.3d 822, 824 (9th Cir. 2007) ("A determination of state law by a state appellate court is . . . binding in a federal habeas action."). While a claim alleging ineffective assistance of counsel does raise a federal constitutional claim cognizable on habeas review, this case turns on a determination of state law made by the Michigan Court of Appeals. The court of appeals reasoned that because the "letters were not authenticated by Higginbotham…they were inadmissible under MRE 901." *Beauchamp*, 2006 WL 657068, at *2. Furthermore, the Michigan Court of Appeals held that the letters constituted inadmissible hearsay. *Id*. Lastly, the court held that the letters were inadmissible even for impeachment purposes. *Id*. The Michigan Court of Appeals' evidentiary rulings constitute per se evidence of trial counsel's effectiveness. Petitioner contends that trial counsel was ineffective because he failed to introduce exculpatory letters. *See* Pet'r's Br. Because the Court of Appeals deemed these letters inadmissible, trial counsel could not have introduced them into evidence, and therefore counsel was not ineffective when he failed to do so. Because this Court is bound by the appellate court's determination of state law, it must accept

the court of appeals' ruling that the letters were inadmissible under the Michigan Rules of Evidence. Trial counsel cannot be deemed ineffective for failing to introduce inadmissible evidence. Because trial counsel did not err by not introducing the letters, the performance prong of the *Strickland* test has not been satisfied and petitioner has failed to establish his prima facie case.

Assuming that the state court's evidentiary rulings were erroneous, petitioner still fails to satisfy the performance prong of the *Strickland* test. The above quoted testimony makes clear that trial counsel for the petitioner made a calculated decision not to introduce the letters into evidence for strategic purposes. The record reflects a clear intention to exclude the letters, not a negligent miscue that led to their exclusion. Thus, the decision not to admit the letters constituted valid trial strategy and must be given the highest level of deference. In this case, counsel conducted an investigation that was reasonable under the circumstances, and therefore counsel's decision to exclude the letters is "virtually unchallengeable[.]" *Strickland*, 466 U.S. at 691. Because counsel must generally be given broad authority to make tactical and strategic decisions, trial counsel's decision to exclude the letters must not be disturbed. Counsel provided a valid rationale for excluding the letters and therefore did not fall below an "objective standard of reasonableness." *Id*. at 687.

In the alternative, it cannot be said that these letters, had they been introduced, would have changed the outcome of the case. In order to establish an ineffective assistance claim, petitioner must prove that, but for trial counsel's errors, the outcome of the case would likely have been different. *See Strickland*, 466 U.S. at 694. Assuming arguendo that petitioner established the first prong of the *Strickland* test, he still cannot prevail because he is unable to

satisfy the prejudice prong. Because the two letters were conflicting in nature, they constituted unreliable evidence that would not have had a great impact on the jury's decision. Because the letters in question seriously lack credibility, it is not reasonably probable that they would have cast a reasonable doubt as to the petitioner's guilt. Thus, this case can be disposed of for a failure to meet one or both prongs of the *Strickland* test.

The Michigan Court of Appeals correctly identified the governing Supreme Court constitutional standard and properly applied it. Because the state court reasonably applied the *Strickland* test, petitioner is not entitled to habeas relief.

E.    *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.

III.    NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390,

401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

                                            s/Paul J. Komives  
                                            PAUL J. KOMIVES  
                                            UNITED STATES MAGISTRATE JUDGE

Dated: July 9, 2009

> The undersigned certifies that a copy of the foregoing order was served on the attorneys of record by electronic means or U.S. Mail on July 9, 2009.
>
>                            s/Eddrey Butts  
>                            Case Manager